## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| **ATIYA HOLLIS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Case No.** |
| **v.** | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| **DEKALB COUNTY SCHOOL** | ) | |
| **DISTRICT,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

## COMPLAINT FOR DAMAGES

COMES NOW Plaintiff Dr. Atiya Hollis ("Hollis" or "Plaintiff"), by and through undersigned counsel, and submits her Complaint against Defendant DeKalb County School District ("DCSD" or "Defendant"), stating as follows:

### I.      NATURE OF COMPLAINT

1.

This is an action by a current educator and administrator of DCSD for retaliation in violation of the Family and Medical Leave Act, 29 U.S.C. §2601, et seq. ("FMLA") and discrimination and retaliation in violation of the Americans with Disabilities Act of 1990 as amended by the ADA Amendments Act of 2008, 42 U.S.C. § 12101, et. seq. (collectively, the "ADA").

## II.    JURISDICTION AND VENUE

2.

This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, 29 U.S.C. § 2617, and 42 U.S. Code § 12117 because this is a civil action arising under the FMLA and the ADA.

3.

Plaintiff has met all administrative prerequisites to filing suit under the ADA, having timely filed a charge with the Equal Employment Opportunity Commission ("EEOC") and having filed the instant suit within 90 days of receipt of her right-to-sue letter.

4.

Venue is proper in this district under 28 U.S.C. § 1391. DCSD is a local governmental entity headquartered and operating within DeKalb County, Georgia, and is subject to the jurisdiction of this Court. All of the acts and omissions complained of herein occurred within the Northern District of Georgia.

## III.   PARTIES

5.

Hollis resides in Lithonia, Georgia, and is a current employee of DCSD.

6.

At all times referenced herein, Hollis was an "eligible employee" as defined under the FMLA because she (1) had been employed by DCSD for at least 12 months; (2) had been employed for at least 1,250 hours of service during the 12-month period immediately preceding the commencement of her FMLA leave; and (3) was employed at a worksite where the employer had at least 50 employees within 75 miles.

7.

DCSD is a local governmental entity providing public primary, middle, and secondary school education in all parts of DeKalb County except within Decatur and Atlanta city limits.

8.

DCSD is a "covered employer" as defined under the FMLA.

9.

DCSD may be served with process by delivering a copy of the summons and complaint to Cheryl Watson-Harris, Superintendent and Chief Executive Officer, DeKalb County School District, 1701 Mountain Industrial Blvd, Stone Mountain, GA, 30083-1027.

## IV.   FACTUAL ALLEGATIONS

10.

Hollis began working for DCSD on August 3, 2004, as a teacher at Rock Chapel Elementary School ("Rock Chapel").

11.

As a teacher, Hollis was responsible for providing quality instruction and implementing the curriculum for assigned students.

12.

The teacher position is an entry-level position in that it requires a Bachelor's degree but does not require any prior teaching experience.

**A. Hollis Is Promoted From Teacher to Academic Data Coach.**

13.

In September of 2013, DCSD's Human Resources Office called Hollis and informed her that she was receiving a "promotion" to the position of academic data coach.

14.

Academic data coaches utilize data to support staff in developing and improving learning opportunities for students in addition to providing coaching support for elementary, middle or high school teachers in core classes. Academic

data coaches are responsible for ensuring that student achievement data drives instructional decisions at the classroom and school level.

15.

In contrast to teachers, academic data coaches are required to have three years classroom teaching experience or closely related experience in addition to a Bachelor's degree.

## B. Hollis Is Recruited to Join Redan Elementary School Due to Her "Exceptional Skills and Credentials."

16.

In May of 2015, then Principal of Rock Chapel, Dr. Katrina Massey ("Massey"), recommended Hollis for a vacant academic data coach position at Redan Elementary School ("Redan Elementary") for the 2015-2016 school year.

17.

The Principal of Redan Elementary, Dr. Deborah Cowan-Steele ("Cowan-Steele"), reached out to Hollis on May 23, 2015, to schedule an interview, referencing Hollis's "exceptional skills and credentials."

18.

Hollis gladly applied for the position because it would bring her closer to home and to her son.

19.

Hollis was offered the position and began working as an academic data coach at Redan Elementary in August of 2015.

### C. Hollis Is Promoted From Academic Data Coach to Instructional Support Specialist.

20.

Hollis excelled in her position during her first year at Redan Elementary and received consistent praise for her many accomplishments.

21.

In recognition of her stellar performance, Cowan-Steele offered Hollis a "promotion" (in the words of the human resources department) to the position of instructional support specialist ("ISS") effective August 1, 2016.

22.

ISS is recognized as a leadership position by the state of Georgia. It allows educators to pursue an educational leadership certificate, which is not available to teachers and academic coaches.

23.

The ISS position also has more rigorous qualification requirements than those of teachers and academic data coaches. ISSs must possess at least a Master's degree in Education and a minimum of three years successful classroom teaching,

supervisory level education administration, or closely related experience.

24.

ISSs are charged with assisting the school administration by providing support

and guidance in the instructional operations of the school. Specifically, they:

- Design and deliver professional learning related to formative assessments to school staff.
- Serve as a co-lead for the schools to ensure all practices comport with state requirements related to formative assessments (e.g., student learning objectives).
- Assist the administration in executing an instructional management system as a tool for formative assessments.
- Assist teachers in reflecting on and analyzing their practices by reviewing student work to inform instruction for student achievement.
- Observe teachers to assess instructional effectiveness as it relates to student achievement and teacher quality.
- Provide teachers with opportunities for observation of exemplary practice and model lessons, as needed.
- Confer with beginning teachers in utilizing the appropriate teaching methodologies through techniques such as team teaching, demonstrations, simulations, and consultations.
- Serve as a liaison to establish, maintain, and promote a confidential and non-evaluative relationship with all teachers to identify instructional resources and support structured.
- Provide informative assessments and processes samples for identified teachers to promote effective classroom practices and student learning methods.
- Administer and/or support the state and local standardized testing processes and policies.
- Assist the principal and other administrators with administration of the total school program in accordance with all applicable requirements and regulations.
- Assist in organizing and implementing staff development opportunities.
- Stay abreast of educational research, trends, and issues.

- Perform other duties as assigned by appropriate administrator.

25.

As an ISS, Hollis also served as Chair of the Student Support Team (SST). As such, she organized and facilitated research-based interventions for general education students with academic deficiencies. Hollis created a systematic multi-tiered system of supports (MTSS) process that was so popular that she was tasked with instructing administrators at another school on how to implement it.

26.

Hollis once again excelled in her new position and was consistently praised for her many achievements.

**D. Hollis Suffers a Medical Emergency and Goes on FMLA Leave.**

27.

On October 27, 2017, Hollis experienced a severe headache and dizziness. When she visited the school nurse, she was told that her blood pressure was at "stroke level." She was advised to have someone come pick her up or wait until she could drive home.

28.

When Hollis tried to drive home, her entire left side became numb and seemingly paralyzed. She called the school for help, and a school counselor called

911 on her behalf.

29.

After seeking further medical treatment, Hollis was diagnosed with acute anxiety, depression, and post-traumatic stress disorder.

30.

Hollis requested and was approved for FMLA leave shortly thereafter.

**E. Hollis Returns From Her First FMLA Leave and Is Subjected to Ongoing Harassment and Changed Work Conditions.**

31.

Hollis was on FMLA leave from October 30, 2017, through January 4, 2018.

32.

Immediately upon her return on January 5, 2018, Hollis was subjected to different terms, conditions, and privileges of employment by Cowan-Steele.

33.

Specifically, Cowan-Steele changed Hollis's schedule and duties so that Hollis was isolated during morning and afternoon duty at the back of the school by herself instead of greeting parents, teachers, and students in the front office, as she had always been assigned to do before going on FMLA leave.

34.

Cowan-Steele also changed Hollis's lunch duty from the last lunch duty

shift—which is typically the calmest shift—to the most disruptive lunch duty shift.

35.

Cowan-Steele further instructed her assistant to start bringing parents looking to register their children for school into Hollis's office throughout the day, causing significant disruptions to Hollis's work. Prior to Hollis taking FMLA leave, the parents had registered in the front office or the empty room next door.

36.

Additionally, Cowan-Steele transferred Hollis from the room that had always been designated for the ISS to a smaller and less desirable office located in the middle of two very disruptive open concept classrooms.

37.

DCSD did not subject similarly situated support staff outside of Hollis's protected class to the same type of changes in duties, responsibilities, and work conditions.

38.

The stressful work environment created by the new work conditions exacerbated Hollis's disability.

39.

Upon the advice of her doctor, Hollis went back on FMLA leave from January

16 until February 23, 2018.

40.

On February 20, 2018, while still on leave, Hollis met with the regional superintendent and her coordinator to discuss Hollis's concern that she was being retaliated against for taking medical leave for a known disability. She explained how the harassment and retaliation had exacerbated her disability even further, and mentioned that she would submit a request for reasonable accommodations upon her return to work.

41.

Unbeknownst to Hollis at the time, Cowan-Steele began taking steps to replace Hollis only two days later, on February 22, 2018, by posting her ISS position on DCSD's jobsite.

**F. Hollis Returns From Her Second FMLA Leave, Requests Accommodations, and Is Subjected to Continued Harassment.**

42.

Hollis returned to work on February 26, 2018. At that point, she requested reasonable accommodations in the form of additional breaks, reasonable adjustments to duties, and a transfer to an ISS position at another school. She also asked that another proctor be present with her if she was asked to administer student testing, which is a high-stress event.

43.

Hollis did not hear back from DCSD regarding her requested accommodation for several weeks.

44.

Meanwhile, Cowan-Steele's retaliation and harassment of Hollis continued.

45.

Cowan-Steele interfered with Hollis's ability to schedule support sessions with teachers, which was an integral part of Hollis's job.

46.

Cowan-Steele also assigned Hollis new duties that did not fall within Hollis's job description and which Hollis had never before been asked to perform.

47.

For example, Cowan-Steele ordered Hollis to serve as a substitute teacher for an extremely disruptive and behaviorally challenged class.

48.

Before going on FMLA leave, Hollis had never been asked to serve as a substitute teacher at Redan Elementary.

49.

Cowan-Steele also ordered Hollis to proctor a two-day long student test. Due

to the heightened stress surrounding testing (in a school with significant behavioral issues), Hollis once again requested that another proctor be present along with her. Cowan-Steele refused this request. On the second day of testing, Hollis suffered a panic attack.

50.

Cowan-Steele also moved Hollis to a highly visible office with windows on both sides of the office. Cowan-Steele walked by the office several times a day and watched Hollis work.

51.

Cowan-Steele's heightened scrutiny of Hollis was so obvious that one of the teachers whose classroom was located nearby asked Hollis why Cowan-Steele was monitoring her. The teacher commented that Hollis had the "block hot" because of Cowan-Steele's increased scrutiny.

52.

Hollis's new office was also located in a part of the school that was known for extreme behavioral issues, which further exacerbated Hollis's medical condition.

53.

Again, DCSD did not subject similarly situated support staff outside of Hollis's protected class to the same type of changes in duties, responsibilities, and

work conditions.

**G. Hollis Receives a Demotion One Week After Her Request for Accommodation Is Processed.**

54.

DCSC did not reach out to Hollis regarding her submitted request for accommodations until March 27, 2018, when Glin Darien, Jr. at the Office of Legal Affairs instructed her: "Your request for ADA accommodations has been forwarded to me for handling. I will be back in touch with you after I have had a chance to speak with your Principal about your requests."

55.

Just one week later, on April 3, 2018, at 9:40 a.m., Cowan-Steele sent Hollis an email informing her that she was being "reassigned" to a teacher position.

56.

The reassignment from ISS to a teacher was a significant demotion in rank, status, job title, duties, responsibilities, and roles.  In fact, it was a two-tier demotion from ISS to Academic Coach to Teacher (as evidenced by the progression of Hollis's prior promotions).

57.

The proffered reason for Hollis's reassignment was "No Allotment and the Needs of the Students." This reason was false and pretextual.

58.

According to then DCSD Superintendent Dr. Stephen Green, every school was allotted one ISS per school. Hollis was the only ISS at Redan Elementary School. Accordingly, there was an allotment for Hollis's ISS position.

59.

Additionally, as Hollis later learned, Cowan-Steele had posted Hollis's ISS position on February 22, 2018, four days before Hollis was scheduled to return from FMLA leave, with a listed start date of February 28, 2018.

60.

The fact that Cowan-Steele advertised an open ISS position on February 22, 2018, directly contradicts Cowan-Steele's claim that Hollis was being demoted because there was no need or allotment for an ISS as of April 3, 2018.

61.

Hollis was the only support staff "reassigned" to a classroom position.

**H. Hollis Is Transferred Against Her Will To a Teacher Position at Stone Mountain Elementary School, Where Retaliation Continues.**

62.

After being demoted from an ISS position to a teacher position, Hollis was transferred against her will to a third-grade teaching position at Stone Mountain Elementary School.

63.

The increased stress of serving in a teacher position at an at-risk school exacerbated Hollis's medical condition, and she was diagnosed with temporary adjustment disorder.

64.

Hollis took medical leave in October of 2018 in connection with her disability.

65.

While Hollis was on leave, the regional superintendent, Dr. Michelle Jones, called her and tried to force her to return to work. Jones shamed and scolded Hollis for taking leave despite knowing of Hollis's disability and the medical need for a temporary leave.

66.

Jones's berating of Hollis for taking ADA-protected leave exacerbated Hollis's condition to such an extent that she had to seek medical treatment.

67.

Hollis has suffered significant pecuniary and non-pecuniary damages as a result of Defendant's unlawful actions.

## COUNT I
## FMLA Retaliation

### 68.

Hollis repeats and realleges the preceding paragraphs as if fully set forth herein.

### 69.

Hollis was an eligible employee under the FMLA and qualified for her position.

### 70.

Defendant is a covered employer under the FMLA.

### 71.

Hollis engaged in protected activity under the FMLA by exercising her right to request and take FMLA leave.

### 72.

Defendant subjected Hollis to a materially adverse action when it subjected her to continuous harassment that culminated in her demotion.

### 73.

There is a causal connection between Hollis's exercise of her rights under the FMLA and the subsequent materially adverse action.

74.

Defendant's proffered reason for the demotion is false and mere pretext for retaliation.

75.

As a direct and proximate result of Defendant's wrongful acts, Hollis has suffered and continues to suffer substantial economic and non-pecuniary damages.

76.

Defendant willfully and wantonly disregarded Hollis's rights, and its actions toward Hollis were undertaken in bad faith.

77.

Hollis is entitled to liquidated damages, lost wages and benefits, front pay, compensatory damages, attorney fees and costs, prejudgment interest, and any other relief available under the law.

**COUNT II**
**ADA Discrimination and Failure to Accommodate**

78.

Hollis repeats and realleges the preceding paragraphs as if fully set forth herein.

79.

Hollis has at all relevant times been a qualified individual who can perform

the essential functions of her job with or without reasonable accommodation.

80.

Hollis has at all relevant times had a covered disability under the ADA.

81.

Hollis was subjected to unlawful discrimination because of her disability.

82.

Hollis was treated less favorably than similarly situated individuals outside her protected class with regard to the terms, conditions, and privileges of her employment.

83.

Hollis was discriminated against based on a known disability when she was demoted from ISS to a teacher position.

84.

Defendant's proffered reason for Hollis's demotion is false and mere pretext for discrimination.

85.

Hollis requested reasonable accommodations in connection with a known disability.

86.

Defendant failed to engage in the interactive process when it waited a month to respond to Hollis's request for a reasonable accommodation.

87.

Hollis was denied reasonable accommodations.

88.

As a direct and proximate result of Defendant's wrongful acts, Hollis has suffered and continues to suffer substantial economic and non-pecuniary damages.

89.

Defendant willfully and wantonly disregarded Hollis's rights, and its actions toward Hollis were undertaken in bad faith.

90.

Hollis is entitled to punitive damages, lost wages and benefits, front pay, compensatory damages, attorney fees and costs, prejudgment interest, and any other relief available under the law.

## COUNT III
## ADA Retaliation and Interference

91.

Hollis repeats and realleges the preceding paragraphs as if fully set forth herein.

92.

Hollis has at all relevant times been a qualified individual who can perform the essential functions of her job with or without reasonable accommodation.

93.

Hollis has at all relevant times had a covered disability under the ADA.

94.

Defendant interfered with Hollis's statutorily protected ADA rights when it harassed, demoted, and subjected Hollis to different terms, conditions, and privileges of employment after she sought leave and accommodations for a known disability.

95.

Hollis engaged in protected activity under the ADA when she complained of disparate treatment and harassment after returning from medical leave.

96.

Defendant retaliated against Hollis for engaging in protected activity by harassing, demoting, and subjecting Hollis to different terms, conditions, and privileges of employment.

97.

Defendant subjected Hollis to a materially adverse action when it subjected her to ongoing harassment that culminated in her demotion.

98.

There was a causal connection between the protected conduct and the subsequent materially adverse action.

99.

Defendant's proffered reason for Hollis's demotion is false and mere pretext for retaliation.

100.

As a direct and proximate result of Defendant's wrongful acts, Hollis has suffered and continues to suffer substantial economic and non-pecuniary damages.

101.

Defendant willfully and wantonly disregarded Hollis's rights, and its actions toward Hollis were undertaken in bad faith.

102.

Hollis is entitled to punitive damages, lost wages and benefits, front pay, compensatory damages, attorney fees and costs, prejudgment interest, and any other relief available under the law.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully prays for relief as follows:

a) Compensatory damages for emotional pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, injury to professional standing, injury to character or reputation, injury to credit standing, loss of health, and any other non-pecuniary losses incurred due to the discriminatory conduct;

b) Punitive damages based on Defendant's willful, malicious, intentional, and deliberate acts;

c) Past and future lost wages and benefits, plus interest;

d) Liquidated damages;

e) All costs and reasonable attorneys' fees; and

f) Such additional or alternative relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all claims properly triable by a jury.

Date: April 2, 2021.

Respectfully submitted,

**BERGMAR LAW LLC**

*/s/ Nina Maja Bergmar*
Nina Maja Bergmar
Georgia Bar No. 982879
135 Auburn Ave. NE, Ste. 210
Atlanta, GA 30303
nmb@bergmarlaw.com
Tel. (470) 239-2096
Fax. (404) 806-8696

Attorney for Plaintiff